U.S.A. v. Alim Turner, et al. Oral argument, 60 minutes to be shared by defendants, 60 minutes for the plaintiffs. Mr. Van Sinclair, you may proceed. Good morning. Good morning, Your Honor. Steve Van Stempert for the appellant, Milan Prater. I think I'd like to reserve three minutes for rebuttal, if I may. I want to start with the double jeopardy counts. Mr. Prater is the one who pled guilty to the small conspiracy in case number 152. After he pleaded guilty, he was then superseded into the big conspiracy, the poly drug conspiracy in case number 151. That's a double jeopardy problem, as we've discussed in our brief. And there are a couple of problems with the district court's analysis of that question. And for starters, the district court improperly placed the burden of proof on Mr. Prater instead of on the government. And that's pretty clear. I don't think the government even can test that. That's a legal error. I think the analysis is reversible for that reason alone. I have no idea. And I'm actually interested in hearing the government's explanation on that. Because it does seem very odd that you have the charge for my particular defendant, my particular client, and that he was superseded for the exact same conspiracy. I'm not sure why that happened. Do you think your client was set up the way they did it? They waited until he pled guilty before they included him in the other case? I really don't know. All I know is the record. I wasn't involved at the trial level. What I can see on the record is a very strange circumstance. This is something I haven't seen before, and it doesn't really seem to come up in many of the cases. But I think it's pretty clear, regardless of the motivation for what happened, the end result is a double jeopardy problem. And we went through, in the brief, the Cimito factors. So one question on just trying to figure out how this works in terms of whether there's deference to district courts or not. Is there a component of this that does have fact-finding or a component of this that doesn't? I mean, it's just not fact-finding at all, because you could kind of see it both ways, right? You could see double jeopardy, of course, is law, comparing indictments, law. But then you could also imagine the district court thinking it can decide, well, there's a time, place, drug difference, and I find that. Which is it, would you say? Yeah, it's interesting. So I think the Jones case from the Fourth Circuit, I mean, the Fourth Circuit has pretty developed case law on this. And the Jones case basically says, look, if the facts are disputed and you're applying law, and they do this in a double jeopardy context, really it's a question of law that's reviewed de novo. I think to the extent that there are facts that are found, I think then the clear error standard applies. I mean, I'm not going to dispute that. I think even if the clear error standard applies here, really what the district court did was it made a legal error because it implied the wrong analysis. So the analysis that the district court implied was, I'm going to take a look at these two different charged conspiracies and see if they're different. Well, that's the wrong analysis. Really the analysis is, you have to look at the two different charged indictments and determine whether the smaller one is a subset of the larger one. So you're looking at a Venn diagram as opposed to whether they're… It's actually very much like the Blockberger test. Yeah, so it's similar to the Blockberger test. Well, I'd say almost identical in the sense that if it is a lesser included, factually as opposed to element-wise, you have a problem. And the question here is whether this is lesser included, right? Well, I'm not going to dispute that, Your Honor. And that is a… Here's a hypothetical which is like the case, but in asking it, I concede it's not entirely like the case. So let's imagine it really is a subset, like the same people, same location, same time, everything just pure overlap, although we'll say smaller. So maybe the time's shorter, maybe the quantities are different and stuff. But everything else looks like Blockberger comparing elements, say for one thing, different drugs. So one's cocaine and the other is meth. I realize that's why it's hypothetical. See, the Fifth Amendment refers to the same offense. I don't think you're allowed to generalize to the level of drugs, level two drugs. If one's cocaine and one's meth, I just feel like we're not even in the world of double jeopardy anymore. So my hypothetical, which is not the facts of this case, what's the answer to that hypothetical? Well, I think the answer is that, again, the offense would be charged with the conspiracy to distribute controlled substances. That's the offense, right? Right, exactly. It's the same offense for both conspiracies. Exactly. Right, just different drugs. In the superseding indictment, they list meth and a host of drugs, but they don't include marijuana. Okay, so Mr. Griffin is doing a good job as a CJA lawyer, but let's try my hypothetical. Keep it on the facts of my hypothetical as opposed to the facts of the case. Sure. I'm just trying to isolate the point. I just want to know the answer to the situation where my hypothetical is actually very helpful to you in all respects but one. It really is subsumed. It really does look like blockburger in terms of lesser included, save for the fact it's one drug versus another. And what I take you to be saying, I'm just trying to figure this out, is it can be different drugs and you still have a double jeopardy offense. That's your theory. Yes, exactly. What's the best case for that theory? Well, I think that's what happened in the Coral case. Again, that's an unpublished case from this court, but that's what happened there. And it was as clean as I just gave it? To me, it's like an antitrust violation for selling toilet paper versus pens. I just don't understand how you would say one's lesser included when they're just different products, even though everything else does look like, quote, a sub-conspiracy. So I think what the case is, and I think Coral talks about this, is that the offense is to distribute controlled substances. And I think the government argued this at the trial, that it doesn't really matter what the controlled substance is for purposes of the conviction. It just has to be an agreement to distribute controlled substances. So that's the same offense. Now, the element of the controlled substance may be met by, say, meth or cocaine or something else, but it's going to be the same offense that's charged, the conspiracy to distribute controlled substances, even though the particular controlled substance at issue is different between the two things. I think that's what happened in the Court. I'll look at the case, but just to give you a sense of where I am, that's my big hiccup. Sure. Just so you know where I'm coming from. That strikes me as pretty wild. Sure, I appreciate that. If I can be the PGA attorney again. Sure. The other thing is, the hypothetical said you had different conspirators. Here, we don't know who the co-conspirators are in either 151 or 152. Well, 152 I guess we do, don't we? But your case, the indictment just says, other conspirators known and unknown to the government, right? If I may answer the question, I'm running out of time here. Yeah, so in 151, that was the charge that went to trial. We know who some of the co-conspirators were. I think they were the bite swords. 152 is unindicted co-conspirators, right? The government didn't identify who they were. They still haven't, have they? Pardon me? They still have not? No, I have no idea. Okay, it's their burden to establish that the co-conspirators are different people. That's correct. So they have not sustained their burden of showing there are co-conspirators that are different than the big conspiracy, right? I think that's the problem. Yes, you are. Exactly. So does it make a difference if they're low level? So if we have bigger quantities than one? So now I'm outside my earlier hypothetical, now actually talking about this case. Does it make a difference if in the smaller conspiracy the unidentified co-conspirators are low level versus in the other conspiracy where the other conspirators were much higher level? Is that just another, like, still controlled substance? So I think it, I'm not sure whether it would make a difference or not. I mean, the question is whether there's an agreement by conspiracy to engage in this particular controlled substance. Exactly. So the question is, here we don't know who they were, right? I mean, the government never explained who they were. I think in the trial in 151, they said, look, if you're a vice lord, you're in the conspiracy, that's it. There's no question that Mr. Prater was in the vice lords at the time that he made the distribution of that issue in 152. So it seems to me that there's really no other candidates for who these unidentified co-conspirators would be other than other vice lords. But frankly, I mean, that's the problem that the government's making. The government has to, you know, that's why the burden of proof is on the government. The government has to be the one who says, look, here's who these unidentified co-conspirators are. They're different people. And if that was the case, then we could have that discussion. On this record, we just don't have that. So one other thing, I'm just, I don't, I feel a little clueless about how this works. So when you have a sequencing the way I understand this to have occurred, where your client pleads guilty to the smaller conspiracy, then he's indicted in a broader one. Are you allowed to use the guilty plea as proof in the second case? And what happened on that front here? So on that front, I do not believe there's any reference to the guilty plea in the trial. So that didn't happen here. So why, which way does that cut? I mean, it seems to me kind of funny if they were exactly the same. One would have thought, well, the part against Prater is not going to be difficult. He already pled guilty to the exact same agreement. Right. So. Yeah, I agree. This is a very strange scenario. If they had used the guilty plea against him, I think there would be significant. But why doesn't that prove the government mistakenly, earnestly, whatever, really thought of them as two different agreements? Otherwise, why would you not use this gift bag next to you? Well, it doesn't really matter if the government was mistaken or thought it was different. I mean, they have to show that there's no double jeopardy because the burden of proof is on them. Once the prima facie case is made. And so, yes. So the more the burden is on them, the odder it is they didn't use the gift bag. You get the point? They absolutely are. And I'm not sure why they didn't just explain that at the hearing. If this really was a possibility. Different location, different time, different levels. One with large quantities of drugs, one small, one with guns, one without guns. There's a lot of other reasons why they thought this would hurt more than help. Well, that's not evident from the record at all. I mean, if we look, as we look through the Sinico factors, look at the Sinico factors based on the evidence in the record. That's what I just did. I just walked through them. But it's pretty clear, I think, from the Sinico factors that they all. I mean, the one is a subset of the other one, right? So whether there's guns involved in the larger conspiracy, you could carve out, the government could carve out of that larger conspiracy a segment that didn't involve guns. You could carve out different time, different geography, guns, no guns, different quantities, and different drug. You could. Yes. And that's really the question. That's why I started with the drug. Because I thought that was the simplest point. But I may be wrong. I mean, I'll look at the Curl case. Thank you, Your Honor. All right. Thank you for the questions. Thank you. Good morning, Your Honor. Good morning. I'm here this morning representing Ronald Turner, and I reserve two minutes for rebuttal, if I may. Your Honor, I'd like to focus this court's attention this morning on the sentencing that occurred in this case. And to set the table, my client, who was 26 years old at the time of the federal sentencing, got sentenced to a consecutive life sentence. And he got sentenced to a consecutive life sentence for 17 phone calls to his brother over a 27-day period. That was the extent of his conduct involved in this case. And specifically, I'd like to focus this court's attention in on the procedural error that occurred at sentencing in the calculation of the advisory guidelines range. And that is that under 3B1.1, you get an enhancement of two, three, or four levels if you're an organizer, leader, manager, supervisor. In this case, my client was convicted of three different counts. He was convicted of conspiracy on the drugs. He was convicted of another drug count. And he was convicted of conspiracy to commit money laundering. And that is what controlled the guidelines range in this case. And the reason it controlled the guidelines range is that under 2S1.1A1, they subsumed the drug conspiracy and all those calculations on the money laundering conspiracy and then added two because the money laundering involved illegal conduct. And that, therefore, superseded the rest of the calculations under the guidelines. And the reason that is is because they're all grouped together under 3D1.2 for purposes of sentencing. So when that happens and you want to impose an enhancement for 3B1.1, the government is required to show under its application note 2A, I believe it is, of the 2S1.1 guideline, that the defendant was an organizer or leader of the money laundering conspiracy. They did not in this case. Instead, they focused on the fact that he was an organizer or leader of the drug conspiracy. And that's the problem in this case because the application note 2A says that you cannot use that conduct when you're looking at 3B1.1 under 2S1.1. But the instruction has this language, quote, that the defendant was a member of the conspiracy charged in the relevant count of the indictment. I mean, is the point that that's too subtle? No, the relevant count of the indictment is the 2S1.1 money laundering conspiracy. And that is the one that they did the calculation on. And that's why it's clear under that, and that's why they have this particular application note, is because of this problem here, which is what the district court did in this case, which is you can't add the 3B1.1 and then go on to 2S1.1, start from that enhanced guideline with the Chapter 3 enhancements, and then add in from there. And that's exactly what probation did. It's exactly what the district court did in this case. And so this court has twice found exactly in the way that I'm arguing today, albeit in unpublished cases. One was United States v. Pass, and the other one was United States v. Bodina. Both of those courts, albeit unpublished cases, both of those panels read 2S1.1 application note 2 exactly the same way as I've argued it to you today and said that you can't do it the other way. And why it makes a difference in this case. And the reason it makes a difference is that when you take out, when you find that there is no enhancement under 3B1.1, it actually then removes another two-point enhancement, which was given for recruiting of a minor, because you have to have a 3B1.1 enhancement to get that enhancement. So that takes us down to a total offense level of 42. A total offense level of 42 with Mr. Turner's criminal history category now takes him to a 360 to life and not an advisory guidelines range of life. And so it gives him a chance to get a sentence that has a number of months and a number of years put on it, and gives him a chance to get good time to care of it, and it gives him a chance to actually get out of prison before he goes out in a box. And that's why it's eminently important that the guidelines have been correctly calculated in this case. I have several minutes left if there are no other questions about this topic. Can I just ask a clarification? Absolutely. Is your point that he wasn't a leader for purposes of the money laundering? That's exactly correct. Actually, there's a lot of communications between him and his brother about what to do with the money, where to put it, how to hide it. It's kind of a two-fold argument. Number one, he was not a leader with regards to the money laundering. Number two... That's a fact. I mean, you're saying the facts that the district court looked at, because there are facts.  Absolutely. Where to hide the money, put it in different businesses, WhatsApp, Western Union. And kind of if you do my backup to that, which is the district court made absolutely no findings in that regard in any event. So if you look at the sentencing hearing, it's page ID 12589 is when the start of the findings happened. Virtually all of the district court's findings only relate to the drug conspiracy. So even if there are some facts in the record where we can argue, they never got there. The district court said, at the very least, there needs to be a remand in this case. And I guess I would finally note one other thing that I wanted. There was an objection to that? So there was an objection to the 3B1.1 enhancement in this case, and a lot of argument. The application note two, which I'm addressing today, was not raised to the district court. Was a BOSFIC question given? Yes.  So we can, and my opponent has argued that this is under plain air standard, but even under plain air standard, the Molina case out of the Supreme Court says that if it's an erroneous guidelines calculation. How about the two unpublished cases of ours? Were they plain air cases? So PASS was definitely a plain air case. I don't remember on Medina. The 10th Circuit case that I sent you, also in my brief that recently found in exactly the same way, was also a plain air case, and they reversed on this topic as well under plain air standard post Molina. And the only other thing I wanted to say is that because of the length of the time this appeal has been going on, there have been new guidelines amendments. Amendment 821 applies to my defendant now. So on the sentencing, his criminal history category is actually going to go down, which helps him further in terms of the 360 to life. Thank you, Your Honors. Thank you.  May it please the court, my name is Steve Jagger, and I represent Aline Turner in this appeal. I ask the court to reserve two minutes for rebuttal. The issuing court should not have approved the wiretap authorizations, and the district court erred in denying Aline's motion to suppress evidence obtained from those wiretaps. There are several factors supporting this position. First, it's undisputed that strict compliance with Title III is required. Here, investigators, primarily Stryker, failed to show the necessity requirement was satisfied. To satisfy it, he had to show a full and complete statement as to whether or not other investigative procedures have been tried and failed. What's your take on their actual explanation? Well, I think they had an explanation. He had explanations. He walks through each of the different forms of other investigational methods, but I think they conflate difficult with failure. I think they conflate difficult with necessity. In his affidavit and in his application, he walks through more than nine traditional investigatory methods up to that point and provides information before his affidavit that has been obtained from oral and written reports and documents from law enforcement agencies and databases, physical surveillance and video surveillance, confidential informants, public records, pin register information, cell phone information, consensually recorded and documented calls and text messages, controlled drug purchases, and on and on. Wait, maybe I'm losing track. You're on the ceiling point, right? I'm not on the ceiling. I'm on the necessity requirement.  I don't think that they proved the necessity for the wiretap at all.  And I think if you look at what he provided in his affidavit and application to the issuing court and then what the court ultimately denied in the motion to suppress, Stryker walks through all of these different avenues that they had done up to that point. He had worked with the CI since November of 2018. They had six controlled buys from December 2018 until January of 2019. They used administrative subpoenas. They authorized pin registers. Stryker spends 18 pages of his affidavit talking about what they already uncovered and what they already succeeded in discovering in the investigation up to the point of the wiretap application. So clearly he wasn't failing at using other traditional investigatory methods up until that point. And then the government argues, well, he doesn't really have to show that. He just has to basically give a substantial consideration to these other methods. But when Stryker starts addressing the wiretap and the need for the wiretap, he claims it's the only reasonable investigative technique that has a reasonable likelihood of achieving the goals of the investigation. But he later amends in the affidavit and says that wiretapping in conjunction with other traditional methods is really the only way that the investigation can be successful. Why would he want to continue to use other traditional methods if he thought in the future that we're going to have a likelihood of failing? What's your best case on this point? What's your best case where it's going to obviously be exactly the same, but this kind of effort and then your view that all they're doing is complaining about not getting more? Well, I think on some level I think United States v. Rice is some of the best law just because I think his affidavit in the application is somewhat misleading about what he really had achieved or what he might achieve moving forward. And Rice allows that if there is misleading information in the affidavit or in the application, then you don't have to give the same amount of deference to the issuing court that you would otherwise have to do. And here clearly when he walks through all of the different traditional investigative methods and explains why it may or may not work, he doesn't really say that they're going to fail. He says things along the lines of, well, it might provide information, but it's not going to provide the amount of information that I want about the scope of the DTO or about those who are involved, or it's going to provide information. Rice was concerned about that. Well, Rice was concerned about misleading the issuing judge about the success or the methods done in the prior investigation up to that point, which I think is the same as what we have here with Stryker's application. He represents certain things to the issuing court and to, I mean, ultimately the district court and the motion to suppress that are somewhat misleading as far as what he can or cannot achieve because he's clearly successful up to that point. He was more successful with the wiretap, obviously. Well, yeah, sure. It's just very hard cases. He's like, when is it enough? I mean, you can see they found more here, which is obviously always the case, otherwise the wiretap, you don't shout at the wiretap if it doesn't find more information. But these are such hard cases for us because you're always saying, well, they could have done more, they could have done more. You can't really prove that. They can't really prove precisely that they could. They can say they don't think they could have found information, but it's hard to show that with absolute certainty. But I think we can show here that they have had success up until the point of the application. They did the first application. They found nothing on Eileen Turner at all, hardly. He acknowledges, yeah, this was a failure as far as information on Eileen Turner. So then they go for a second wiretap on Turner's phone at that point, trying to specifically get information on him. They've always found some information. We've used these tools. We've found absolutely no information about any wrongdoing. We're going to use a wiretap. We think that will be the key. And they've always found some information. The question is when those efforts are drawing up. It's just a hard line to draw. It's very fact-specific. In this case, there's a demonstrated effort to use lots of other means. Successfully, which is part of where we think it falls short. Okay, there's some success. What sort of deference do we give the magistrate that issued the authority for the wiretap on necessity? Well, I think under Rice, I think you have some leeway to not give the normal deference that you have to give, because Rice says under those facts where the trial court or the issuing judge is misled, this court reason that normal deference given to trial courts does not logically apply when the issuing judge is given misleading information. If the magistrate is not misled, what is the deference we give him? Then the district court gives the issuing judge controlling. I think they give them the benefit of the doubt. Abuse of discretion? Yeah, abuse of discretion is the standard. But I don't think you have to do that here. I think here the question is was the affidavit in the application straightforward and honest? Does it actually meet the standard of necessity? I think to Judge Rutler's credit, it is a difficult thing to say, but here Stryker only says it's difficult to do. He doesn't really say it's going to fail, and the law says it needs to say that it's going to fail. So here he says it's difficult to get this because of the conditions of the neighborhood or because of the parking lot that we have to get into or because these are sophisticated criminals who know what poll cameras are. But the law doesn't say it has to be easy for the investigators. It says it has to be necessary, a necessity. So I think there's two different tests going on here, and I think the issuing magistrate saw necessity where really Stryker is just saying this is difficult for us. Was there a wiretap affidavit in relation to the conspiracy to sell crack cocaine? Was there a wiretap... Yeah, application. There was a wiretap first for Prater. Prater, did that involve the crack cocaine that's subject to case 151 or 152, whichever one it is? I am uncertain about that, Your Honor. I don't know for sure if that applied to his crack cocaine case or not for Prater. Okay. All right. Thank you. And I see that I am out of time, so if there's no additional questions, thank you. Thank you. Good morning, Your Honors. Eric Eck is on behalf of Ushery Stewart. I have reserved three minutes. Judges, I would like to speak about the... This is... There's a lot of issues, a lot of defendants. This issue is only related to Mr. Stewart, and it's the search of his home, pursuant to a warrant that had no facts in it whatsoever connecting drug activity to his home. This issue is one that is reoccurring at district court levels. It's something I deal with at district court levels on a regular basis. And there is this... In 2016, there's the Brown case that has a clear holding that there needs to be, if the affidavit fails to include facts that directly connect the residents with the suspected drug trafficking, it cannot be inferred that drugs will be found in that home, even if... There's some conflict in our case law in this circuit. So I think... Some cases have said that you don't have to have that. I think the best way to deal with that is the way that has been dealt with via someone, and then most recently in Grant. So you have a... Judge Bush ultimately writes both these opinions, so there's some continuity here, and this is where I focus my thoughts in trying to figure out what that means. And what I propose is that the black letter law here is that there has to be some evidence of a direct connection. Isn't that what we held in the Yonvab case of Carpenter? I'm not familiar with that case, right off the top of my head. If you look it up, it'll say there has to be a nexus with the drug activity and the house. That's a holding of the case. And that is what I am arguing. I don't know exactly what you're arguing. Okay, the problem I have with your position, though, is that the district court ruled that the evidence could come in anyway. You ruled there was probable cause or the affidavit established probable cause. And then the district judge also ruled in the alternative that even if the affidavit did not establish probable cause, the police had good faith to rely upon that affidavit. I don't see you arguing the absence of good faith in your principle brief. You raise issues in your principle brief, and that's what we consider here on appeal. And one of those issues is that there was no probable cause for the issues that weren't. I don't see you attacking the ruling that in the event there wasn't, there was good faith. I mean, did you raise that in your principle brief? Generally, because that finding was made, Judge, I would recognize that I should have raised that in the principle brief. Generally, I address good faith in rebuttal after the government raises it. You did in your reply brief. You did. And I certainly can address good faith here. I'm just not sure that preserved the issue. That's all. Well, I certainly do believe and have argued, obviously, in the rebuttal and I can argue here, that good faith should not save this warrant. Okay. All right. Assuming somehow you get over the preservation requirement, why not? I mean, as Judge Raebler pointed out, we have cases that go both ways on this nexus issue on whether you have to have evidence established in the nexus with the house and the drug dealing. And we have some cases that actually say that you can infer that a known drug dealer stores drugs in his house. I mean, there are cases that say that. Well, the fact that we have that authority and the magistrate issues the warrant finding probable cause, I mean, doesn't the conflict of our authority establish the good faith of the officers who rely on the funds? That warrant? I don't think there's a conflict on the point of whether there has to be some evidence of a direct connection between the drug dealer. I think there is. I mean, I think we have cases that say that there is a inference that if you're a known drug dealer, that you store drugs in your house and therefore you can have a warrant issued. I disagree with those cases, but I think there are cases. So the way I would frame that, Judge, is there's this threshold of probable cause that has to be filled in. And part of that can be filled in. Part of it can be filled in by the fact that drug dealers often keep drugs at their house. It just can't break the threshold. The threshold can only be broken when there is direct evidence. And that threshold gets lowered a little bit for good faith. I admit that. And the quote from the grant case from last year says that it has to get to a minimally sufficient nexus, which is what we're dealing with with good faith. So we have probable cause threshold. We have bare bones threshold. To get to that, the affidavit had to be supported by some reference to drug activity at the residence. So this is a watered down version of the overall direct connection, but some reference to drug activity. So that is what police officers are on notice of, that it's going to be declared, and that has presidential value because that's what Brown says as well. Brown says in the good faith analysis that there needs to be a plausible connection to the residence. So this line that probable cause doesn't get broken and minimally sufficient nexus doesn't get broken, until and unless there is some reference to this house being involved in the drug activity. Does it make a difference how much, I mean, this is the continuous point, that if you're doing trafficking for a long time with large quantities, does that affect the nexus inquiry, or is it no, no, no, no, you still got to show, I don't care whether it's one deal, three deals, or 100 deals, you got to show the house is involved. I would argue that the law is it doesn't matter. But if, because it's a matter of, because ultimately being this major drug player. You understand the intuition, right? The more you're doing, the odder it is that your house is not involved, you know, assuming you sleep there each night. Well, but, yes and no. I mean, large drug dealers often have what are called stash houses, and so I think that. Well, it's not their house, it's not their house, that's different. The son finds this place they're sleeping, you're saying they're not sleeping. Right, and I'm saying that the inference that they're going to keep their product at home, if they're a large drug dealer, I don't know if that, I don't think the largeness. In other words, you're sufficiently big enough, you graduate and you get a stash house, and you don't use the home at all. I'm just saying that that inference is somewhat ambiguous and doesn't break the threshold. And that the overall picture here is you have to have that evidence and this major drug player, the note two from Brown, the note two Brown major player exception that the district court discussed, is not a substitute for the black letter law that there has to be a direct connection. Well, you say direct, I mean circumstantial evidence. I think circumstantial evidence would work. Someone definitely has circumstantial evidence here. Yeah. I agree. Thank you. Good morning. Good morning, Your Honors. Excuse me. Randall Reagan, representing Demetrius Bibbs here today. I would like to ask to reserve about three minutes of my time for rebuttal. Sure. In this case, Reagan sentenced me to trial, Mr. Bibbs being one of them. And I sat for most of the trial not saying a word because the vast bulk of the evidence had nothing to do with Mr. Bibbs. Mr. Bibbs was, all the other defendants were members of the vice lords. They all lived either in Cleveland or Knoxville. The government's cooperating witnesses were all vice lords. Mr. Bibbs was not. Mr. Bibbs lived in Chattanooga. The only evidence connecting Mr. Bibbs to any conspiracy was the testimony of Cameron Billups, the government's main witness against him. And Mr. Billups testified with regard to drug transactions involving Mr. Bibbs. The only one that involved anyone else in this conspiracy was Mr. Billups said that Mr. Bibbs gave him some money to buy heroin from Elaine Turner. Mr. Billups also testified. So just to orient me, we're on sufficiency grounds? Yes, you're on sufficiency grounds. But there's no proof that Mr. Bibbs knew about this conspiracy, that he knew the full scope of the conspiracy, or that he intentionally joined the conspiracy. So the evidence is there's testimony, drug transactions, and there's testimony about a gun, right? Yes, sir. And then you're saying that's it and therefore no proof of an agreement? Well, I'd say there's no proof of an agreement for several reasons, one of which is that, again, this is the only drug transaction that Billups testified about involving anyone else in the conspiracy. He says that Mr. Bibbs gave him money to buy seven grams, I believe it was, of heroin from Elaine Turner. Billups also testified that Mr. Bibbs did not know Elaine Turner, did not know who he was. Also, Billups testified that he stayed at Mr. Bibbs' apartment on occasion because his girlfriend, who was the estranged wife of a Chattanooga police homicide detective, worked near where Mr. Bibbs lived, and Mr. Billups would go there to wait until she got off work to go get her and take her home. Billups said that he had been at Mr. Bibbs' apartment only four or five times. He said all they did there was smoke, marijuana, and heroin. There was a search warrant executed at Mr. Bibbs' apartment that kind of got this whole thing kicked off with him and Mr. Billups. But at that raid, there was a gun found in the apartment, but it was found on a table next to the air mattress in the living room where Mr. Billups and his girlfriend were sleeping. He searched the apartment, they searched the full apartment. Mr. Bibbs had his bedroom in the back. In the bedroom, they found $198 and less than two grams of heroin. Mr. Bibbs was charged initially with the felony possession of the heroin with the intent to distribute. He was found guilty of the lesser and clearer offense of simple possession of heroin. He was not found guilty of possessing it with the intent to distribute. There were no large quantities of drugs found there. There was no large amounts of money. Again, the only firearm that was found was next to Mr. Billups where he was sleeping. Yes, we did make all the same points to the jury, but they agreed with us that it was simple possession of the amounts that were in the apartment. What I'm saying is... Yes, you're right. What we're saying is that there was a failure of the government to prove a common goal between that Mr. Bibbs joined this conspiracy knowing that there was a common goal, that he intentionally joined this conspiracy. You don't have to know every member of it. That's true. You don't have to know every member. That's true, but your association with a member of the conspiracy doesn't make you a member of the conspiracy. That's what Mr. Billups testified to. He was associated with Mr. Bibbs on various occasions, but the only time ever that he says there was anything that happened that had anything to do with the other members of this conspiracy was when Mr. Bibbs gave him money to buy heroin from Turner. Mr. Bibbs didn't know. He didn't know where Billups was getting his heroin from. It was pretty much a buyer-seller relationship at that point. At any rate, there were several issues regarding the sentencing, including regarding the mitigating role adjustment. The trial court stood out of the mitigating role adjustment. As you can see from the record, Mr. Bibbs, there were thousands of telephone calls, thousands of text messages. There was tons of evidence about these unwanted activities of the other co-defendants in this conspiracy. Again, the only evidence regarding Mr. Bibbs in this conspiracy was Billups' testimony that he bought seven grams of heroin. We suspect that he is substantially less culpable than the average member in this conspiracy, particularly when you look and see the full scope of it and the small part, if any, that Mr. Bibbs played in this conspiracy. Those are the questions I would draw to the briefs for the other sentencing. All right. Thank you very much. Thank you. Appreciate it. Good morning. Good morning. Beautiful courthouse. My name is Tim Sweeney, police of court. I represent Kadaris Gilmore. Could I please have three minutes for rebuttal, Your Honor? So this case, this is a troubling case to me, I think. I hope it is to you. This kid was 20, 21 years old, this Kadaris Gilmore, and he got LLOP, plus 60. Don't forget the plus 60. Life without parole for drug crimes. That is shocking, and I think the court should do something about it. I think the court has the power to do something about it. I think the law supports relief for this type of outrageous sentence. It was a lot of drugs, right? It was the same amount of drugs as Woogie was involved in, and Woogie, who is 32 years old and has prior convictions, and he got 13 years. He'll be out before these kids are 35. This sentence is outrageous, and this isn't a homicide offense. There's no murder here. People die of these drugs all the time. I think that's one reason the penalties are so harsh is because these people that peddle meth and fentanyl and all these other drugs are killing people. You're saying it's outrageous that you lock them up for life? It is. Peddling drugs that kill people? But, Your Honor, Woogie got 13 years. Well, maybe he should have gotten more. And all of the other co-defendants. I mean, that's why we've raised this as a disproportionate sentencing in violation of Hammerlin. I think there's an Eighth Amendment issue, just a straight Eighth Amendment issue. I think there's an issue of the sentence being substantively unreasonable as well. I mean, all three of those provide a guideline, a map for this court. This is a guideline sentence, is it not? You're talking about guidelines? It's within the guidelines for an adolescent. It's substantively reasonable. I understand. I understand all that, Your Honor. We're an intermediate court, so what's within the realm of what we could realistically do? I mean, it can't be age just yet, so you're saying it's proportionality? I think it can be age. I do think it can be age. I mean, it was age in Missouri when they decided, in the Missouri Supreme Court, decided under the Eighth Amendment that you can't execute kids who are under 18. That was an Eighth Amendment decision by an intermediate court. It wasn't the Supreme Court of the United States. This court can do it. This is a powerful court. This court can do this. Somebody's got to stand up and say you can't send teenagers and adolescents to prison for life for non-homicide drug offenses. Was he a teenager? I thought he was 21. He was 20 and 21 during this offense, Your Honor. So he's not a teenager. I don't think he's an adolescent. The science says he is. Well, but I mean, listen, I'm not trying to cut you off, but I also want to just try to work. I thought the court was – the cases were kind of 18 as a demarcation, and if the point is we need to revisit this and extend it to people 20-21 or write a concurrence that says – or a sentence that says that – Well, I think that's what you're looking for. I've provided three routes for the court to grant relief for this adolescent. He is an adolescent. That's what the science says. They call it, Your Honor, they call it late adolescence. They call it emerging adults. The science works really well in most areas. Not usually for intermediate courts of appeals. We've got to follow the hierarchy of the system. You know, I don't think – It's something we can do in our station. I do think you have the authority to do the bigger step, which is to declare that you can't – that the line needs to move up beyond 18. But beyond that, you've got the question of disproportionate sentencing. And the question is, is this grossly disproportionate? And that's where this court in the Sherrill decision I think suggested in the right case that's the kind of analysis you need to provide. You need to perform that kind of analysis in the right case. You look at the sentence. You look at the sentence imposed on other offenders. You decide whether it's grossly disproportionate. And then when you've got a kid – I mean, think about it. This is a kid. What the court did here is they decided based upon something that was done when somebody was in their adolescence is going to lock them up forever and throw away the key. They're irrevocably corrupt that they'll never get out. That is just an unconscionable sentence, Your Honor, for somebody that age. When, in this case, under the disproportionate analysis, you've got guys like Chris Hounshell who got 13 years. You've got guys like Cameron Billups who got 85 months. I mean, these guys did – their involvement in this crime was much worse than this 20-, 21-year-old kid. That's the fact. That's the disproportionate analysis that Harmelin says this court can do. Those were cooperatives, right? They were. That's all true. They cooperated. They testified. That's true. But is that really the difference? Can you throw somebody's life away because they were too immature to cooperate? You're dealing with adolescence here. You're dealing with people who are children. If any of you have children, you know this. You know that somebody who's 20 is different than somebody who's 32, different than somebody who's 40. These cooperators, in many cases, Your Honors, they were mature adults, much older. Hounshell was 32 years old. Billups was, I believe, or Carmelin was in his 40s. Michael Scott Stewart, who testified against his own son, was in his 40s. I mean, these are the adults who are involved in this conspiracy, and his sentence is pale in comparison to these adolescents who are being thrown away in federal prison forever for drug crimes. You know, Graham is a case involving life without parole for non-homicide drug offenses. It's the Supreme Court of the United States. And they did draw the line at 18 there, but they said, you know, you can't send away teenagers to life without parole for non-homicide drug offenses. Why is it such a stretch for a court with this much authority and this much power to say you can't do that either for somebody who's two years older, for a non-homicide drug offense, you can't throw them away in prison forever? The line drawing gets very difficult. That's part of the problem. I mean, in other words, even if I agree with you 100%, it's really hard. I get why you would propose that line here, but I also understand why someone would then propose 23 in the next case. I mean, you know, you're playing God at that point. And that's why we, I mean, we had a very tough on crime era in the 90s. Happily, we're moving out of this, not as quickly as a lot of us would like. But it is a fundamental reality that the legislature is primarily in charge of this. Let me say the last thing with my time. It's sufficient but not greater than necessary. That's the standard. It's sufficient but not greater than necessary. I mean, you've got different routes to get here. LWOP for an adolescent, it's never going to be. You just don't meet that. It's not sufficient but not greater than necessary. It does not pass that test. The sentence has to be sufficient but not greater than necessary. When a guideline sentence spits out a sentence of life without parole for somebody who's 20 years old, that test cannot be passed. And I think the court can say that. They can say that. And there's enough in this record to say that. I think that's the right thing to do. I mean, I think that's the just thing to do. And I'll wait and reserve the rest of my time. Because I still, after we filed this brief a year and a half ago, I still haven't heard a good argument as to why a 20-year-old kid for this type of an offense needs to be put in prison forever. And I'll wait and I'll listen. And hopefully you will too. Thank you. All right. Thank you. I feel like we should have a fifth-inning stretch here. But let's go with the government's presentation and continue marching through if that's all right. Are you okay with that? You ready to go? Yes, Your Honor. Okay. Great. Mr. Samuelson. Good morning. Good morning. May it please the court, my name is Brian Samuelson and I represent the United States. The defendants in this case were fairly tried, convicted, and sentenced. And this court should affirm those convictions and sentences. There are several issues I'd like to talk about, and I'd like to take them roughly in the order we just heard, starting with double jeopardy. The question central to the double jeopardy inquiry is whether there were multiple conspiracies. Start the question, I'll ask you to try it on the other side. Why was it broken down this way? What's the explanation for that? Your Honor, I don't know. I don't have any insider knowledge about why it was charged the way it was charged. I do think the evidence in the record suggests that the government believed these were two different conspiracies. Who were the other conspirators? In the crack cocaine case, who were the conspirators? If they're not vice lords, who were they? We don't know. Well, if you don't know, then that's one of the factors, isn't it, that we look at? The persons that actually factor two, persons active as co-conspirators. So you can see that we're going to just assume that the co-conspirators and the two conspiracies are vice lords? No, Your Honor. Just because you don't have any evidence of the conventioner. Well, we can't identify who those other co-conspirators are. It's kind of important when we consider the factors, isn't it? Certainly an important factor here is whether the two conspiracies involved the same group of people. And there is evidence that those groups were different, even if we can't identify specifically who was involved in the smaller conspiracy. And here's the best evidence that there were two conspiracies involving two groups of people. This comes from counsel's testimony at trial. He testified that the vice lords were not predominantly engaged in selling crack cocaine. Predominantly. Not predominantly. But they did sell crack cocaine. Sometimes, yes. In fact, the wiretaps were specified that they were looking for crack cocaine. That's true, Your Honor. Yeah, so vice lords aren't dealing with crack cocaine. Well, Hancho went on to testify that he did not know of other vice lords selling crack cocaine as part of the conspiracy. And he denied knowledge of Crater selling crack cocaine as part of the conspiracy. Based on that evidence, the district court could find that these were separate conspiracies involving separate groups. Is it your burden of proof? It is. So it is a factual question. In the case in regrand jury proceedings, this court held that the multiple conspiracies question is a factual question that is reviewed for clear error. And it is judged on a preponderance of the evidence. It is the government's proof to prove that these are different conspiracies once the defendant has made a prima facie case that they may be the same case. In a preponderance of the evidence situation, the burden of proof comes into play if the evidence was in equipoise. But that's not what the district court found here. The district court found that these were separate conspiracies involving separate groups. Did the district court do the right analysis? To my understanding, he just looked at the indictments and said this indictment is different than this. And the Siento factors don't, well, you look at the indictments but you consider the totality of the circumstances. You consider the totality of the facts. Did the district judge do that or did he just look at the indictments? The district court did do that. Originally, the district court looked at the indictments. After trial, it revisited this issue. So it had the full trial record when it denied the renewed double jeopardy motion at the end of trial. So certainly all the evidence that came into trial factored into the district court's decision. And a preponderance of the evidence decision reviewed for clear error based on Hounsfield's testimony, you could find that these are separate conspiracies. So that's not a clearly erroneous decision. You could. It's hypothetical. It's possible. It's not very strong. I mean, you could do a lot of things. But does the weight of the factors show that this exists? That's kind of what I'm looking at, not whether it could. Certainly, Your Honor, and I think Hounsfield's testimony is the best evidence to support the district court's decision. And if the court is unconvinced by that evidence and does find that there was a clearly erroneous finding of multiple conspiracies, it should vacate the conspiracy conviction in case 151 and remand for correction of the judgment. Can I make sure I'm understanding the feature of this? I asked the same question of your friend on the other side. My hypothetical is that I get the point that there's some possible evidence that there was some cocaine being sold in the bigger conspiracy versus cocaine being the main point of the other one. Does the drug types make a difference? I mean, do you just generalize at the level of whatever the category is under federal law and it actually doesn't matter whether it's heroin, cocaine, meth? Because my intuition, hardly being an expert in the area, is that that's quite significant. In my mind, I'm thinking of two antitrust charges, conspiracy to violate antitrust laws with respect to one product versus another. Even with the same players, I would just think, gosh, that's a different agreement, right? Different object to sell a different item. But maybe I'm wrong about that. I'm just supposed to say, is it in that category of drug? And that's all that matters. It doesn't matter if it's a different stripe. I think your intuition is correct. The fact that the two alleged conspiracies may be involved in different drugs would be significant evidence. Are there cases that emphasize? I mean, counsel says quarrel says that not to worry, or I think was suggesting maybe that says that's not as important. I mean, if you don't know the case, don't worry. I can go look at it. But I'm just trying to figure out what the cases say about that. I think the best case supporting different conspiracies here might be Lacey. In there, we had a small drug conspiracy, which was distinct from a larger one, based in large part on the difference in the drugs dealt. So one was a single buy of cocaine, and the other was a much larger conspiracy involving both cocaine and marijuana. The first one was a single buy? How was it a conspiracy? Well, it was based on a single buy bust of cocaine that was evidence of a relatively small conspiracy. And the court found that the difference in size and the difference in substances there. What does quarrel say? If you know. If you don't, don't worry about it. There's a lot here to know. I'm not familiar with the sex of quarrel. Don't worry. Yes, sir. Can I share a little bit of President Griffin's reaction, which is you don't seem overwhelmingly enthusiastic about your argument on this case. I also appreciate that the government has got a different role. And I appreciate when they're not overly enthusiastic, because they help us more, I think, sometimes in private counsel in terms of getting the right answer. So I'm not going to penalize you for that. But I was trying to understand why these were two separate conspiracies as indicted. And it's okay if you didn't talk to the indicting counsel. But obviously, the explanation has to be because they were separate. And so I'm having a little bit of trouble figuring out what your best argument is as to why they're separate. But if it was just done as one conspiracy, then a student could have argued, look, I was just doing cocaine. I was on my own mission. And so I can't be convicted. It could have been acquitted. And in that case, I think maybe then it's a double jeopardy test that you can't prosecute him for cocaine offenses. So it was the idea that we would need to separate out the cocaine offenses, because we know he's doing those. And we also think it's part of this larger conspiracy that's not focused on cocaine. It's on a bunch of other things. And so we're going to also indict him for being part of that conspiracy? Your Honor, I know who you're looking for. And I don't know. I wasn't the indicting counsel. We don't have to know that. What's your best argument? Does that make sense? I want to rule your way. How would I rule your way? Is this a standard review? We defer to the district court's findings? Yes. The best argument is that these are two different conspiracies. I think they were indicted as two different conspiracies because the government believed that they were two different conspiracies. And the best evidence for that comes from Hounschel's, that we have in the record, comes from Hounschel's testimony that the vice lords were predominantly not involved in crack cocaine, and importantly, he didn't know of Crater dealing crack cocaine as part of this conspiracy. He didn't know of other vice lords selling crack cocaine as part of the conspiracy. That evidence, coupled with the preponderance of the evidence standard, reviewed for clear error, allows a finding that these are separate and distinct conspiracies. But there's also evidence that Crater was part of the conspiracy to distribute the other drugs, which is a larger case. Absolutely. Yes. Yes, and there's no conflict in being part of two different conspiracies at the same time. If I join a kickball team with my colleagues at work, and then I go home and I join a kickball team with my neighbors, those are two different teams, even if they play the same sport, they play at the same season, maybe they play in the same rec league, there can be quite a lot of overlap, but they would be two separate teams. If we knew what the teams were, I think I would agree with you. We just don't know who the teams are for the two conspiracies. Other than, I guess, the government knew, because they said co-conspirators known and unknown to the government, and they didn't name anybody. That's true. We assume that they're fellow vice lords, I guess. That's kind of what I do, unless I know somebody else out there. Well, Your Honor, I push back on the word assume a little bit, because there is evidence in the record that these are different people, and that evidence is the testimony that the vice lords were not predominantly engaged in that activity.  That word, okay, there is a crack, okay. Okay. All right. What was his sentence for the conspiracy to which he pled guilty? I don't recall. If you don't recall, it's all right. It was lower than the sentence for the over-action conspiracy. I believe it was 240 months. The first one was 240? I believe so, Your Honor. I know it was lower than the 324 months for which he received... It's still pretty substantial. Yes, Your Honor. Yes, Your Honor. Did the applications for the wiretaps state that Prater conducted crack cocaine transactions in businesses associated with DTO? That's the drug trafficking organization. So is that what one of the affidavits for a wiretap indicated that the DTO, drug trafficking organization, was involved with Prater's crack cocaine? Is that true? The affidavits for the wiretap did include Prater's crack cocaine dealing. Okay. And that also refers to DTO. What is DTO? Drug trafficking organization. That's vice lords, isn't it? Well, at the time the affidavits are drafted, the agents don't have all the facts, right? They're investigating potential criminality. Is there another DTO other than vice lords? Well, that's the central double jeopardy question. Okay. What is the other DTO then? It would be the other smaller conspiracy. Who? But we don't know who they are. We don't know who those other co-conspirators are. Okay. The wiretap was directed to vice lords, was it not? That's true. So, this wiretap wasn't for somebody else. DTO was vice lords, was it? Yes, your honor. And in the investigation... Okay, so vice lords are involved in crack cocaine. That's how you got the wiretap. Or a part of it. Certainly, Prater's ongoing drug dealing is evidence that he may be engaged in criminality. And that's why it shows up in the... Well, doesn't that show that vice lords are involved with crack cocaine? I mean, the government made a representation to the magistrate that the DTO was involved in crack cocaine. And the magistrate assumed that vice lords are the DTO. I think it's relevant. I don't think it's conclusive, particularly because the affidavit... It may not have to be positive, but it's evidence, I think, isn't it? Yes, your honor. Again, if the court is unconvinced that there were two different conspiracies here, and sufficiently unconvinced that it finds clear error in the multiple conspiracies finding, it should vacate the conspiracy count on case 151, which is the larger conspiracy count. In that case, the court should remand for correction of the judgment. I don't believe that there would be any reason to... Not for reset. Not for resetting, your honor, because the sentence wouldn't change given the sentences he received. Would the guidelines change? No, your honor, because the conduct wouldn't have changed. The substantive drug counts were all bundled with the conspiracy count for purposes of guidelines calculation. The drug quantity wouldn't change. The enhancements wouldn't change. So no, I don't believe the guidelines would change. All right, so just on filing this, he would still have the 240 plus the second one? The 240 was concurrent. So the 240 would fit under and be subsumed within the sentences he received for the substantive drug counts. How many times do you have a double jeopardy violation with two different sentences, even though they're concurrent, and it stays the same after the double jeopardy violation is found? It just seems head scratching. Well, I don't think that it is that unusual because the double jeopardy... If the double jeopardy finding is made, it would be a finding that this person has engaged in the overarching drug conspiracy for which he was sentenced and for which he... That was the conduct on which the sentence was based. So to me, it makes sense that the sentence would stay the same. Do you have some examples where that happened? I don't know of any other examples. In criminal cases, forget whether one's a guilty plea, you vacate the second one and you say you're still stuck with the same two sentences. I mean, it doesn't sound like much of a double jeopardy cause. I don't have any other examples where this fact pattern has presented itself to the court, so I can't speak to how common that is or not. The court was looking at the totality of the defendant's conduct at sentencing. In fact, at sentencing, the defendant was sentenced for both the smaller conspiracy and the larger conspiracy simultaneously. So it makes sense that the sentence would be the same for the same conduct because the conduct hasn't changed. Your Honor, I'd like to turn towards the wiretaps and whether the government showed necessity for the wiretaps. The government here established that wiretaps were not the initial step, and the affidavits also established that the government fully considered other traditional techniques, and that's what's required to show necessity. It was not the initial step. There were other initial steps that had been taken, including confidential sources, controlled buys, surveillance, poll cameras, lots of other things. It was also that the government fully considered other traditional techniques. Can you explain why? Your friend on the other side said, if I got this right, that the affidavit was amended later on to sort of change the degree of certainty about what new evidence would be discovered or could have been discovered previously. Well, there were a series of wiretaps. There were three telephones tapping one, two, and three. And so those three affidavits sort of built on each other. So the second affidavit incorporated the information that the first wiretap had found and incorporated new information about why certain techniques would or would not be successful based on sort of the ongoing course of the investigation. Right. Okay. I thought your friend on the other side was arguing that the officers became less certain that they needed to do the wiretap. I mean, I wasn't quite following the argument fully, but less certain why they needed the wiretaps or less certain that the other means wouldn't disclose the information they were looking for? I'm not aware of a particular affidavit being amended sort of before any wiretap was authorized. We haven't amended them at the point of making the sequential applications. Yes, Your Honor, and that supports why the wiretaps are necessary because the investigators at every step are reanalyzing whether more wiretaps are necessary in the course of the investigation to date. So there's no requirement that the government exhausts to completion every other possible investigative technique. All that is required is that this is not the initial step and that serious consideration has been given to other techniques, and that's what happened here. I'd also like to talk about the search warrant for Stewart's residence and whether a sufficient nexus was shown between drug dealing and evidence to be found in the house. The court's opinions do seem to point different ways in this area, but they have been reconciled by this court in Sheckles, which is a 2021 case, and that court laid out how all those cases can be reconciled in fact-specific ways. The court said that there is a required nexus, even without specific evidence, that drugs or drug dealing occurred at the house if the dealer was engaged in continual and ongoing operations typically involving large amounts of drugs. So I would point the court to the Gunter case where there were repeated large-scale transactions were enough to support probable cause for a search warrant, even if there was no specific evidence connecting drugs. What does that make any sense? I would think that the bigger the drug dealer, the more likely he doesn't store it in his house, that he has a stash house that he'll store it somewhere else so that he doesn't have incriminating evidence where he lives. To me, it's kind of the opposite inference, that the larger the drug dealer, the more protective he would be to conceal his drugs. And I think traditionally the court has seen it the other way, that if this is not a one-time thing, if drug dealing is recurrent, if it is over a longer period of time, if there are large amounts of drugs, that it is reasonable to assume that that would show up at the drug dealer's house. Why is that a reasonable inference? I just made the argument for the opposite side. Tell me why it's reasonable for us to assume he's going to store it in his house. I think experience has shown that drug dealers keep evidence of their drug dealing at their house. Oh, do we have studies that say that or something, or what? I think we have case law that says that. I share Judge Griffin's intuition about the size of the drugs. It doesn't make any sense. But that's what makes me wonder if it's the continuity point, that the longer you've been doing it, the harder it is to imagine you wouldn't have evidence at the house. So in other words, there's nothing to do with whether you have 10 kilograms or not. I think continuity is just throwing it out, because I share his intuition. It doesn't seem obvious that the larger the amount of drugs, that means you put it in the house. When articulating this rule, this court in Shekels used the phrase continual and ongoing. So yes, continuity is a part of that. Ongoing is a part of that. It did say typically involving large amounts of drugs. I don't know that large amounts of drugs is required to show the nexus. Certainly, continuity is a big part of establishing probable cause in the situation, and continuity is what was present here. I don't know if you've done studies, but you've probably looked at other circuits. Doesn't basically every circuit allow this inference in the right circumstances? Yes, Your Honor. I assume that's true. The fact that we allow this inference is not unlike basically every other circuit. No, I don't think that's true. Continuous is important. You have to have all those factors met, but we allow inference to be drawn in the right case. Yes, I don't think that this circuit is an outlier in any way in that situation. Where the court has found that there is no nexus, those are cases where there was either a single instance of drug dealing, or these are cases like Brown and Grant and Fitzgerald, and the cases cited in Seward's brief, or where the court lacked corroboration that the defendant even was a drug dealer. And those look very different. Are you aware of the Ironbock case, Carpenter? Yes, Your Honor. Okay. Don't we have a holding in Carpenter, our Ironbock court said there has to be a nexus with the house, and that this inference we're talking about was not sufficient in Carpenter. Was it not? My understanding of Carpenter is that there does need to be a nexus between the place to be searched. We're bound by our Ironbock decisions, are we not? That's true, but the question here is one question downstream of that, which is what evidence is sufficient to establish that nexus. Sure. And the question is whether there needs to be direct evidence that drugs are in the house, or whether sort of continuing and ongoing operations are enough. And this court held in Sheckles, it looked back over its cases and held in Sheckles that where there is continual and ongoing drug dealing, that it's reasonable to assume that the evidence of drug dealing will be in the house, establishing the nexus that is required. I would like to turn to the sufficiency of the evidence. I think before you do it, I think your better position is on good faith for the search of the Stewart house. Do you want to address that a little bit? Certainly. I think this search warrant stands on its own merits, but certainly it stands under the good faith exception. At the very least, this court's precedent's due point, in seemingly different ways, this affidavit was facially valid, or the warrant was facially valid, the affidavit established the minimally sufficient nexus necessary to invoke the good faith doctrine. So certainly on good faith review. Has Stewart appealed the ruling that there was good faith here with the search warrant? Has that been preserved on appeal? I'm not sure, Your Honor. I know that Stewart has appealed the motion to suppress this affidavit, and to the extent that good faith is a part of that, maybe. All right, so you're not arguing lack of preservation of the government here? The good faith issue, you're not arguing lack of preservation by Stewart? No, Your Honor, and I don't think it's necessary. I think good faith, that the affidavit here established the minimally sufficient nexus necessary for an officer to rely on the warrant in good faith, regardless of whether that issue has been preserved or not. Thank you. I'd like to turn to the sufficiency of the evidence as to Mr. Bibbs. There was evidence at trial that Bibbs was a drug dealer, and that his drug dealing was connected to the larger conspiracy as a whole. So I just want to briefly cover that evidence. Bibbs testified that he dealt drugs with Bibbs in the summer of 2019. Bibbs gave Bibbs money to buy heroin from Aleem Turner, and there's evidence of drug trafficking at Bibbs' house. That includes scales and Narcan and presses and baggies and heroin itself. All of that is certainly sufficient to allow a jury to conclude that Bibbs was part of the larger conspiracy, and that verdict should not be dismissed. Well, why isn't that a separate conspiracy? Why could not that be a separate conspiracy? He's got scales and drugs. It goes back to the frame issue of whether you've got two conspiracies or one, and here you're saying it's got to be the same conspiracy, and Craitor, you say they're different. I mean, what ties this one together? Here there is evidence that's tying these heroin transactions through Billups to Aleem Turner to the larger conspiracy. Well, you have Aleem Turner. Do you have anything after Aleem Turner? Certainly, Aleem Turner is plugged into the larger conspiracy. He's a leader of the larger conspiracy. Why couldn't this be a separate conspiracy? Well, because there's an unbroken chain from the body of the conspiracy through Aleem Turner to Billups to Bibbs, all dealing in this particular drug. The government's horrified about double jeopardy claims with double conspiracies. Forgive me. Your Honor, if there are no other questions, I would rest on my brief for the other issues. Can you address – I mean, you're pointing out the last – I think it was the second to last, but maybe talk about the extent of the sentence like in prison for a very young offender. I'm going to set aside the constitutional arguments, but the guidelines calculation are driven significantly by the amount of drug quantity. Is that right? Yes. Yes, the guidelines – so the life sentences in this case, all four of them were within the guidelines. Those guidelines were driven in large part, not entire part, but in large part by the drug quantities involved. And the question that this court faces is not what sentence this court would impose. It is whether the district court had a reasoned basis for the decision it made. And the court fully considered the sentencing factors. It considered the defendant's age. And having heard all the trial testimony, it made the decision it did. And there's no reason to – Can you quantify the amount of drugs issued through the conspiracy was like tens of thousands of individual uses? That's correct. Yeah, so the evidence was there was a five-pound shipment of meth. There was a planned ten-pound shipment. There was an actual five-pound shipment. So there are pounds of methamphetamine, maybe 13 pounds, I think, between all the different shipments of methamphetamine. And a dose of meth is – I think estimates range to about a tenth of a gram. So this is thousands of doses of methamphetamine, which this court has recognized is a very serious drug. It destroys lives. It destroys communities. Certainly the district court was moved by the quantity of methamphetamine involved. Was there a sense that – did Gilmour's counsel argue for a certain sentence? I'm not sure if there was a specific term of use proposed below the guideline sentence. I know they argued for a below-guideline sentence. But, again, the sentence is within the guidelines here, and that's afforded a presumption of reasonableness based on the totality of the factors. Okay. Thank you very much, Mr. Sanderson. We appreciate your argument. Let's get some rebuttal here. Thank you, Your Honors. Just a few points on this double jeopardy issue involving Mr. Craitor. So, first of all, Coral – I did have a chance to actually read it while I was listening to the rest of the argument. Coral involved – it does have a discussion about this, right? So what happens is under 841A1, right, that's the controlled substance offense. And then the specific drugs are named – that's under 841B1A. So that's different ways that the single offense is committed. The government adopted that argument at the charging conference in this case. That's at the transcript record entry 541-3, BID 8797, where the government explains this. So the mere fact that there are different drugs in the crack cocaine conspiracy, the little conspiracy, and then the poly drug conspiracy, it doesn't make a difference under Coral, and Coral explains that. In Coral, I will say, the poly drug conspiracy involved a bunch of drugs, including cocaine, and then the little conspiracy in Coral also involved cocaine. So the court did have that in front of it, but that wasn't what drove the analysis there. I would also point the court to the Maxwell case that we cite. That's another unpublished case from this court – a decision from this court. In that one, there was a single conspiracy charge for heroin, a single conspiracy charge for cocaine-based, two different drugs, and the court – the government conceded error that there was – What's the name of that case? That's the Maxwell case. We cite that on page 41 of our brief. How about Lacey? I don't know if you know that one, but I think that was the one Mr. Samuelson mentioned. Yeah, I looked at the brief, and it looks like it's an unpublished case from 1993. I'm not familiar with that. You don't know it? Yeah, I'm not familiar with that other than what is represented in the brief. I would also say, Your Honors, the degree to which the large conspiracy was charged, that's under the government's control as well. So for whatever reason – there's definitely evidence in the record that other vice lords distributed whatever they could get a hold of. Any drugs they could get a hold of – Kedaris Gilmore apparently distributed crack cocaine. For whatever reason, the government decided not to charge the big conspiracy and decided not to include cocaine based on that. That's their decision. They have control over that. The fact that they made that decision doesn't mean that there was actually two separate conspiratorial agreements. On the issue of remand, Your Honors, absolutely we request resentencing. That's the typical posture in these sorts of cases, and as I think Judge Ransom pointed out, it would be very odd if there was a vacator of count one that there would not be a general remand here. I think that's the appropriate remedy here. So unless the court has other questions. Thank you very much. Thank you. Good morning, Your Honors. Opposing counsel didn't address any of my arguments in his argument, so unless the court has any questions –  Overwhelmed, yes. Another win for Mr. Schatz. Thank you, Your Honors.  I have just three really brief points to point out for the court. First I want to clarify the confusion about the amendment. Within the same affidavit for TT1, the first wiretap, Stryker states that the wiretaps are, quote, the only investigative technique that has a reasonable likelihood of achieving the goals of the investigation. Then later in that same affidavit, he kind of amends that statement and says that wiretaps will only be successful if used, quote, in conjunction with the other investigative techniques currently being used in the investigation. So it's all within the same first TT1 affidavit, but he kind of changes his own position. Secondly, the government stated that the agents don't have all the facts when the affidavits and applications were drafted, but here they had a lot of facts before they ever drafted even the first application. They already knew 12 target subjects at that time, including Elise and Turner. They knew target subjects' residences. They had already conducted some surveillance of everybody, obtained information from confidential informants, and already knew the ranks of a lot of these individuals within the vice board world. So they did already have a lot of information from traditional methods. And finally, as my friend from the other side said about wiretaps generally not used as the initial step in the investigation, here that's true. It wasn't the initial step, but it was early in the investigation because even Stryker acknowledges that the financial investigation into all of this was in its infancy, and he also recognizes that search warrants have not yet been utilized. He thought it was premature for search warrants to take effect, but he thought that at a later date they would provide some usefulness to the investigation. So it is pretty early in the investigation when they go through the wiretap. So unless the court has any other questions for me, I appreciate the time and ask you to consider overturning Mr. Turner's conviction. Thank you. Good morning again, Your Honors. So in terms of the United States has argued this footnote too, which has been talked about in the Shekels case, if there is, quote, overwhelming evidence of someone being a major drug player of a continuous drug trafficking organization. I would be remiss if I had left today without it showing, although I'm arguing that that should not be a substitute for there needing to be a direct connection. Those factors aren't met either here. We have a text message from this warrant affidavit in June about getting some bread. That's during September. So we have a June text message about getting some bread. Then we have a July allegation of a two-ounce drug deal, and then we have in August discussions about this plan of how the shipment may come to this other address. So we're nowhere near Mr. Stewart's address in any of that evidence, but we're also not having an evidence of a continuous drug trafficking organization that's going to be in September suggesting that evidence is going to be in Ushery Stewart's home when it comes to September. So there was no direct connection, and I believe the law, you know, yes, Shekels happens, but you have this grant case, albeit unpublished, that says at a minimum, after surveying all this law, at a minimum, there must be facts that the residents had been used in drug trafficking. That's either the law or it's not. But what about good faith? I mean, the more confusing the law is, the more it looks like good faith. So good faith, and I'll just quote from the government's brief, from the State v. McCoy case, or United States v. McCoy, minimally sufficient, so now we're at bare bones threshold, minimally sufficient means one in which there is some connection, regardless of how remote it may have been, some modicum of evidence, however slight, between the criminal activity at issue and the place to be searched. So whether we're talking about minimally sufficient or we're talking about probable cause, there has to be this connection. There has to be something. And as Judge Griffin talked about, that can be circumstantial. I think Sumlin is a great case to show circumstantially you can connect to a residence. And the way they circumstantially connected it there was the timing of text messages suggesting that's probably where the person came from before a drug deal that resulted in an overdose. So what police officers are on notice of is they've got to have something that puts drug activity in this residence. Thank you, Your Honors. Thank you. This whole argument is a lot like the trial was. I had to sit around and listen to people talk about everybody else but my client. And as the government says, there was this unbroken chain from my client through Billups to Turner. And, in fact, there is that unbroken chain, according to Billups. He says he bought heroin from Turner, money that my client gave him. And I know you don't... But he also said that my client does not know who Liam Turner is. The other aspect of this also is, it's in the record, is that Billups testified that Turner fronted the drugs to me, fronted 14 grams of heroin to me. And around the same time, he says he bought this 7 grams from Turner with Mr. Bibbs' money. There may be a separate... There may be a direct chain there, but it still requires knowledge of the conspiracy. It still requires that Mr. Bibbs intentionally join this conspiracy rather than just buying heroin from Billups. And the other aspect is that Billups, talking about Billups and Mr. Bibbs selling drugs together, what Billups said was, he said, I had my drugs, he had his drugs, and we sold drugs together. He didn't say we were in a conspiracy to sell drugs together. He said he had his, I had mine, we sold. But, again, the... There's... I know you don't have to know everybody in the conspiracy, but you ought to have to know more than one. How can you know about there's this whole conspiracy out there that you're knowing them intentionally? John, if you only know the one person and you don't know anybody else, you don't know who he's getting these drugs from. So we submit there's insufficient evidence in this case. We would ask that you vacate his conviction and any alternative remand for resentencing based upon the objections we had to the sentencing. Thank you. Thank you. Last but not least, thank you for the consideration of this important case. Life without parole, it's still... You're still at that with an adolescent kid. You asked the question, Judge Riedler, you know, let's talk about how much drugs were involved. We double counted here to get the drugs. That five pound... There were two five-pounders that were counted. Don't forget that. One of them was taken by law enforcement. And so it never got into the stream of commerce. It was only one five-pounder that counted. I mean, so there's a lot... And these issues are raised. These are not brief. We've addressed these. These are guidelines issues that you can look at and you can reduce this... What did Gilmour ask for below? I'm sorry? Did Gilmour make a specific... He asked for... He did. I don't remember. I think it was 300 months, I believe, might have been the amount that he... I just don't remember, to be honest, Your Honor. But they did ask for a sentence much less than the life without parole and the life sentence that was imposed. But remember that. They double counted to get to that high number. There's other issues that are addressed in the briefs. I don't think they were sufficiently answered in the government's brief. And I think hopefully the court will take a close look at that. That gets the same result for Gilmour. He gets a lesser sentence. He shouldn't be in prison forever for these drug crimes. And you still have... I sat here. It's been a year. We filed the brief. There's no real response as to why an adolescent should go away forever for drug crimes. I've still not heard one. I sit here today. I still haven't heard one. And the government says, okay, I'm going to sit down. I'm not going to respond. You still have to address substantive reasonableness. This is not a substantively reasonable sentence. That's always an issue. You don't have to get to a constitutional issue to conclude that this sentence is not substantively reasonable because it doesn't meet the requirements of sufficient but not greater than necessary. You're at the ceiling, judges. You're as high as you can go. This is the harshest sentence that could be imposed on an adolescent. You can't go any higher than that. So when you're analyzing sufficient but not greater than necessary, you've got to remember that. It's as high as it can go. It can't go any higher. And they added 60 more months to boot. And this is for drug crimes. This court in Sherrill, I didn't hear a response to Sherrill. I mean, I know it's just dicta in Sherrill, but the court did say in Sherrill, and I think it's important, in 2020, a couple years ago, we leave to future cases the issue of whether a life sentence would be cruel and unusual or substantively unreasonable if a young adult defendant's criminal history and other conduct do not outweigh his youth. That's his case. He's a three. His criminal history and other conduct do not outweigh his youth. He was involved in some drug crimes. You know, a lot of drugs, sure, I agree. But it's the same drug crimes that gets Woogie, a recidivist offender, 13 years. He's going to be out before this kid's 35. Now, this court, I think you should think about these things. This sentence is outrageous for a kid this age. You know, some of you may get the privilege of doing commencement speeches. Look out at those kids. They're his age. You know, you're out there, you're telling these kids, come on, let's go forth. Do good. Try to do good things, you know. Get out of Gilmore's that age. You know, that's the kind of kid. And we send him away to prison forever for a drug crime. That's wrong. This court should do something about it. Thank you, Mr. Sweeney. Thanks to all of you for excellent arguments, excellent briefs. Quite a case. I see that everybody but Mr. Schott is court-appointed. Mr. Schott, of course, court-appointed for life. We're really grateful for the advocacy. Your clients are really fortunate to have such terrific advocates, and obviously it helps the system and us do a better job, or at least the best job we can do. So thank you so much. We really appreciate it. The clerk may adjourn the court. Honorable court, now adjourned.